UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

NATHANIEL PROVOST
3108 Salem Lane
Suamico, WI  54313

and

JENNIFER PROVOST
3108 Salem Lane
Suamico, WI  54313

in their individual capacities, and on behalf of their minor children,

B.P., a minor child
3108 Salem Lane
Suamico, WI  54313

and

D.P., a minor child
3108 Salem Lane
Suamico, WI  54313

   Plaintiffs

v.               Case No.

HOWARD-SUAMICO SCHOOL DISTRICT
2706 Lineville Road
Green Bay, WI  54313

and

VICTOR MURPHY, in his individual capacity,
2904 Westline Road
Green Bay, WI  54313

and

DAMIAN LACROIX, in his official capacity,
c/o Howard-Suamico School District
2706 Lineville Road
Green Bay, WI  54313

and

TERESA FORD, in her official capacity,
2848 Brookview Drive
Green Bay, WI 54313

and

RYAN WELNETZ, in his official and individual capacities,
1022 Stockbury Ct.
Green Bay, WI 54313

and

RACHELLE PAULSEN, in her official and individual capacities,
3707 Mighty Oak Trail
Green Bay, WI 54313

      Defendants.

---

## COMPLAINT

NOW COMES the above-named Plaintiffs, Nathan Provost, Jennifer Provost, B.P, and D.P., by and through their attorneys, Law Firm of Conway, Olejniczak, & Jerry, S.C., and as and for their Complaint against Defendants, allege and show to the Court as follows:

### THE PARTIES

1. Plaintiffs Nathaniel Provost and Jennifer Provost are adults who reside at 3108 Salem Lane, Suamico, Wisconsin 54313.

2. Plaintiffs B.P. and D.P. are minor children of Plaintiffs Nathaniel and Jennifer Provost who both reside with their parents.

3. Defendant Howard Suamico School District ("HSSD" or the "District") is a school district organized under the laws of the State of Wisconsin. HSSD's District Office is located at 2706 Lineville Road, Green Bay, Wisconsin 54313. HSSD employs nearly 1,000 staff members and

operates eight schools within the District, one of which is Suamico Elementary School. HSSD operates under the oversight of the seven-member HSSD Board of Education. The Board's mission is to enact policies and allocate resources to develop all students' full academic potential and to promote their social and emotional growth. As part of the Board's efforts to facilitate a successful school district, the Board purports to implement those practices, programs and activities that will provide the best education possible for the students in the District.

4. Defendant Victor Murphy is an adult who, on information and belief, resides at and may be served at 2904 Westline Road, Green Bay, Wisconsin 54313. At times relevant to this action, Mr. Murphy was employed by HSSD as a teacher and a coach.

5. Defendant Damian LaCroix is an adult who, on information and belief, resides in Suamico, Wisconsin, and may be served c/o Howard-Suamico School District, 2706 Lineville Road, Green Bay, Wisconsin 54313. At times relevant to this action, Mr. LaCroix was employed as the Superintendent of HSSD. As Superintendent, Mr. LaCroix had responsibility to work together with families and community to ensure that students in the District have the knowledge and skills that are needed to succeed in a changing world.

6. Defendant Teresa Ford is an adult who, on information and belief, resides and may be served at 2848 Brookview Drive, Green Bay, Wisconsin 54313. At times relevant to this action, Ms. Ford served as President of the Howard-Suamico School District Board of Education.

7. Defendant Ryan Welnetz is an adult who, on information and belief, resides and may be served at 1022 Stockbury Ct., Green Bay, Wisconsin 54313. At times relevant to this action, Mr. Welnetz was employed by HSSD as the Principal of Suamico Elementary School.

8.  Defendant Rachelle Paulsen is an adult who, on information and belief, resides at and may be served at 3707 Mighty Oak Trail, Green Bay, Wisconsin 54313.  At times relevant to this action, Ms. Paulsen was a member of the Howard-Suamico School District Board of Education.

## JURISDICTION AND VENUE

9.  Plaintiffs' claims are based upon, and arise out of, Defendants' violations of federal and state law.  In significant part, Plaintiffs' claims are brought under the Civil Rights Act of 1871, 42 U.S.C. §1983 ("Section 1983") and are based upon Defendants' actions and failures to act in violation of Plaintiffs' rights under the First, Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution.  This Court has subject matter jurisdiction over those claims pursuant to 28 U.S.C. §1331.

10.  In addition, Plaintiffs also raise state law claims.  This Court has subject matter jurisdiction over those claims because those claims arise out of the same facts and form part of the same case or controversy.  Therefore, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367(a).

11.  Each Defendant resides in this judicial district and HSSD's District Office is located in this judicial district.  All, or nearly all, of the events at issue in this case occurred in this judicial district.  Therefore, venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b)(1), (2).

12.  Plaintiffs have fulfilled all administrative prerequisites to this action.  Pursuant to Wis.Stat. §893.80, Plaintiffs served their Notice of Claims for Damages on HSSD and on Mr. Murphy on June 11, 2020.  Mr. Murphy never responded to Plaintiffs' Notice of Claims.  By correspondence dated October 5, 2020, HSSD responded and "disallowed" Plaintiffs' claims.  No other administrative prerequisites apply to the claims raised in this action.

## NATURE OF THE ACTION

13. While acting as playground monitor at the Suamico Elementary School on February 12, 2020, Mr. Murphy violently attacked and physically assaulted and battered B.P.

14. The Incident was captured on a security camera. After Plaintiffs complained to Defendants, the HSSD Board of Education terminated Mr. Murphy's employment.

15. In the days, weeks and months following Mr. Murphy's termination, Plaintiffs were subjected to a relentless campaign of harassment, bullying, and retaliation from many in the community including HSSD students, teachers, administrators, and even the HSSD Board of Education who blamed Plaintiffs for Mr. Murphy's termination. In addition to participating in such harassment, bullying and retaliation, Defendants tolerated and encouraged such behaviors in others.

16. In this lawsuit, Plaintiffs raise state law claims against Defendants for assault and battery, negligent supervision, negligent infliction of emotional distress, and intentional infliction of emotional distress.

17. Plaintiffs also assert that Mr. Murphy's attack on B.P. was made possible by Defendants' decision to tolerate and otherwise ignore Mr. Murphy's known propensity for bullying, intimidating, and using physical force and violence against the students in his charge. Defendants' indifference to Mr. Murphy's previous behaviors was the moving force that made Mr. Murphy's attack on B.P. possible. Plaintiffs assert that Mr. Murphy's attack on B.P. and the actions and inactions of Defendants in failing and refusing to rein in Mr. Murphy prior to that attack violated Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution. Plaintiffs bring those claims against Defendants under the Civil Rights Act of 1871, 42 U.S.C. §1983 ("Section 1983").

18.  In addition, by tolerating, encouraging and participating in the campaign of harassment, bullying and retaliation against Plaintiffs that followed Mr. Murphy's termination, Defendants also violated Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution.  Plaintiffs bring those claims against Defendants under Section 1983.

## FACTUAL ALLEGATIONS

19.  As part of his regular job duties, on February 12, 2020, Defendant Murphy was engaged by the District to act as a playground monitor at the Suamico Elementary School.  At the appropriate time, the students were called to gather to return to class.  As the students began to gather to return to class, Mr. Murphy angrily reprimanded B.P.  On information and belief, Mr. Murphy ordered B.P. to "come here."  Mr. Murphy continued to castigate B.P. as she walked slowly toward him.  At the point that B.P. and Mr. Murphy were within an arm's length of each other, Mr. Murphy suddenly and violently lashed out with both of his arms and fists and violently struck B.P. in her neck and upper chest area.  The blow was delivered with full force, and the power and violence of the blow caused B.P.'s body to jerk backward and her head and neck to violently whiplash back and forth.

20.  The February 12 attack was captured on a security camera.

21.  Shortly after the attack, Plaintiffs complained and HSSD then terminated Mr. Murphy's employment.

22.  In the days, weeks and months following the attack, Plaintiffs were subjected to a relentless campaign of harassment, bullying, and retaliation from members of the community including many HSSD students, teachers, administrators, and even the HSSD School Board who claimed that Plaintiffs were responsible for Mr. Murphy's bad behavior and termination.  Examples of such harassment, bullying and retaliation include, but are not limited to:

a. A petition was circulated on social media by Suamico Village Trustee Dan Roddan. The petition falsely described the circumstances surrounding Mr. Murphy's termination and placed the blame for Mr. Murphy's termination on B.P. and her parents. On information and belief, many staff members and administrators of HSSD were among the more than 6,000 individuals who signed the petition. Many of those individuals also posted hateful and disparaging comments directed at Plaintiffs.

b. B.P.'s classmates shunned her and openly mocked her while at school, claiming that B.P. was "the one who got Mr. Murphy fired." At least one class-mate repeatedly "punched" B.P. in her stomach. Teachers and staff of HSSD made derogatory comments about Plaintiffs and their involvement in the Murphy termination within earshot of both B.P. and D.P. Although B.P. and her parents reported this bullying to her teacher and to Mr. Welnetz, little to nothing was done to stop it.

c. The first instance of "punching" was captured on video, and after Plaintiffs complained, Mr. Welnetz promised that he "would take care of it." Despite his promise, the same child punched B.P. again a few days later. The second instance was not captured on video, so Mr. Welnetz and B.P.'s teacher both accused B.P. of lying about the incident.

d. B.P.'s former kindergarten teacher was always warm and friendly to B.P., but after Mr. Murphy's termination, she refused to acknowledge B.P. or greet her in the hall as she had always done. She told Mr. Provost that she "fully supported" Mr. Murphy and that what Plaintiffs "had done to" Mr. Murphy "was terrible".

e. Six days after Mr. Murphy attacked B.P., someone mailed an anonymous letter to Mrs. Provost's employer falsely claiming that Mrs. Provost has a "mental health condition." The

writer claimed that Mrs. Provost was unfit for her job and insisted that she be required to submit to counseling. On information and belief, Mr. Welnetz was responsible for that letter.

    f.  On February 21, 2020, Ms. Paulsen sent an email to Mrs. Provost that said:

> Jennifer, we now realize we made the wrong decision, and we as a Board, would appreciate if you and your husband, would teach respect and values to your children from this point going forward.

    g.  In mid-March, someone mailed an anonymous letter to Mrs. Provost in which the writer shamelessly lied about various events, repeatedly insulted Mrs. Provost and her family, made a number of veiled threats, and roundly condemned Plaintiffs for Mr. Murphy's bad behavior and termination. On information and belief, Mr. Welnetz was responsible for that letter.

    h.  Prior to the Murphy termination, both B.P. and D.P. were heavily involved and very successful in team sports including softball, basketball and football. After the Murphy termination, numerous athletic coaches in the community – some of whom are employed by or affiliated with HSSD – openly discriminated against B.P. and D.P. and excluded them or limited them from participation. In some cases, these individuals admitted that the reason for their behavior toward B.P. and D.P. was the Murphy termination.

23.  In addition to participating in such harassment, bullying and retaliation, Defendants tolerated and encouraged such behaviors in others. Because Mr. LaCroix, Ms. Ford, Mr. Welnetz, Ms. Paulsen, and HSSD failed to communicate the truth regarding Mr. Murphy's assault of B.P. and his resulting termination, Mr. Murphy and his supporters were able to create a false narrative regarding the events of February 12. Hundreds of individuals in the community believed the lies told by Mr. Murphy and his supporters about the attack and the reason for Mr. Murphy's termination. As a result, Plaintiffs became a pariah in the community, and were

harassed in grocery stores, at school, at work, in other public places, and even in their own neighborhood.

## CLAIMS

### COUNT I – ASSAULT AND BATTERY
### (AGAINST MR. MURPHY)

24. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

25. When Mr. Murphy verbally and physically attacked B.P., he did so knowing that his conduct would cause B.P. fear, bodily harm and pain. Mr. Murphy intended to – and did – cause B.P. to be fearful, and he intended to – and did – inflict bodily harm and injury on her.

26. Mr. Murphy's physical attack on B.P. was unlawful and constituted a willful use of force and violence upon B.P.

27. Plaintiffs did not consent to the attack.

28. As an immediate consequence and direct result of Mr. Murphy's attack on her, B.P. suffered bodily pain, headaches, soreness, embarrassment, anxiety, and fear. Thereafter, as a direct result of Mr. Murphy's attack on her, B.P. was distraught, and she suffered – and continues to suffer – fear, anxiety, sadness, hopelessness, depression, suicidal ideations, and other maladies.

29. B.P.'s parents and brother were direct witnesses to the physical and emotional impact that Mr. Murphy's attack had on her. They heard and witnessed B.P.'s anxiety, fear, hopelessness, sadness, her wishes "to die," and other emotional manifestations of the harm caused by Mr. Murphy. Consequently, Mr. and Mrs. Provost and D.P. also experienced extreme emotional distress.

30. As a result of Mr. Murphy's actions, Plaintiffs have suffered physical harm, and emotional damage and distress, as well as other harm and injuries to be determined at trial.

COUNT II – NEGLIGENT SUPERVISION
(AGAINST HSSD, MR. LACROIX, MS. FORD, AND MR. WELNETZ)

31. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

32. On information and belief, the February 12, 2020 attack on B.P. was not the first time that Mr. Murphy had bullied, intimidated, and physically assaulted and battered a student. To the contrary, on information and belief, Mr. Murphy used inappropriate bullying, intimidation, physical force, and violence against students in his charge on multiple occasions prior to February 12, 2020.

33. On information and belief, multiple students, teachers, parents and others complained to Defendants about Mr. Murphy's inappropriate, violent behavior. Defendants were well-aware that Mr. Murphy was prone to bully, intimidate and use physical force and violence against the students in his charge.

34. On information and belief, in those prior cases, Defendants took no action or took inadequate action against Mr. Murphy because he was well-beloved by many in the community, by many members of HSSD administration, by many staff members, and by many of the students of HSSD. Defendants chose to ignore Mr. Murphy's unlawful and dangerous behavior rather than to appropriately address the problem.

35. Mr. LaCroix, Ms. Ford, Mr. Welnetz, Ms. Paulsen and HSSD all owed B.P. a ministerial duty to protect her from known threats to her safety while she was at school. That duty included cases – such as this case – where the threat to student safety came directly from a member of the HSSD staff.

36. Defendants breached that duty when, on information and belief, Defendants turned a blind eye to Mr. Murphy's violent proclivities. Defendants failed to take adequate and reasonable steps to stop his unlawful and violent behaviors.

37. Mr. Murphy's attack on B.P. caused B.P. substantial physical and emotional damages and injuries. Mr. Murphy's attack was a cause-in-fact of B.P.'s injuries.

38. Defendants' indifference and failure to rein in Mr. Murphy and to take adequate and reasonable steps to put a stop to his violent behaviors was a cause-in-fact of Mr. Murphy's attack on B.P.

39. The harm suffered by B.P. at the hands of Mr. Murphy was the result of Defendants' indifference and failure to rein in Mr. Murphy and protect the students of the District, including B.P. Had HSSD properly disciplined and restrained Mr. Murphy for the prior incidents, the February 12 attack would not have occurred.

40. Defendants' decision to turn a blind eye to the threat posed by Mr. Murphy's propensities toward violence and to continue to expose the students of HSSD (including B.P.) to such violence was a malicious, willful and intentional act.

41. B.P.'s parents and brother were direct witnesses to the physical and emotional impact that Mr. Murphy's attack had on her. They heard and witnessed B.P.'s anxiety, fear, hopelessness, sadness, her wishes "to die," and other emotional manifestations of the harm caused by Mr. Murphy. Consequently, Mr. and Mrs. Provost and D.P. also experienced extreme emotional distress.

42. As a result of Defendants' actions and failures to act, Plaintiffs have suffered physical and emotional distress, as well as other losses, damages and injuries to be determined at trial.

## COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

43. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

### Emotional Distress Arising Out of Mr. Murphy's Attack
### (Against HSSD, Mr. LaCroix, Ms. Ford, and Mr. Welnetz)

44. On information and belief, prior to February 12, 2020, Mr. Murphy used inappropriate bullying, intimidation, physical force, and violence against students in his charge on multiple occasions. On information and belief, multiple students, teachers, parents and others complained to Defendants about Mr. Murphy's inappropriate, violent behavior. Defendants were well-aware that Mr. Murphy was prone to bully, intimidate and use physical force and violence against the students in his charge.

45. Defendants knew or should have known that their failure to rein in Mr. Murphy would lead to further incidents in which Mr. Murphy bullied, intimidated and used physical force and violence against the students in his charge.

46. Mr. LaCroix, Ms. Ford, Mr. Welnetz, and HSSD all owed a ministerial duty to all HSSD students – including B.P. – to protect those students from known threats to their safety while they were at school. That duty includes cases where – as here – the threat to student safety came directly from a member of the HSSD staff.

47. Defendants breached that duty when Defendants failed to rein in Mr. Murphy and chose instead to ignore Mr. Murphy's violent proclivities. Defendants' indifference and failure to rein in Mr. Murphy and failure to take adequate and reasonable steps to protect B.P. from Mr. Murphy's violent behaviors was a cause-in-fact of Mr. Murphy's attack on B.P. and the resulting harm to Plaintiffs.

48. The harm suffered by B.P. at the hands of Mr. Murphy was the result of Defendants' indifference and breach of their duty to protect B.P. from a known danger.

49. Had HSSD properly disciplined and restrained Mr. Murphy, the February 12 attack would not have occurred.

50. B.P.'s parents and brother were direct witnesses to the physical and emotional impact that Mr. Murphy's attack had on her. They heard and witnessed B.P.'s anxiety, fear, hopelessness, sadness, her wishes "to die," and other emotional manifestations of the harm caused by Mr. Murphy and HSSD's failure to act. Consequently, Mr. and Mrs. Provost and D.P. also experienced extreme emotional distress.

51. Defendants' decision to turn a blind eye to the threat posed by Mr. Murphy's propensities toward violence and to continue to expose the students of HSSD (including B.P.) to such violence was a malicious, willful and intentional act.

<u>Emotional Distress Arising Out of Defendant's Participation in, and Refusal and Failure to Curtail, the Campaign of Harassment Against Plaintiffs</u>
<u>(Against HSSD, Mr. LaCroix, Ms. Ford, Mr. Welnetz and Ms. Paulsen)</u>

52. Defendants were aware of the relentless campaign of harassment, bullying, and retaliation against Plaintiffs that followed the termination of Mr. Murphy. Defendants were also aware that some HSSD teachers, administrators, and even the HSSD Board of Education were participants in that campaign against Plaintiffs.

53. Defendants could have ended the campaign of harassment, bullying and retaliation against Plaintiffs by telling the truth about the termination of Mr. Murphy. Instead, Defendants issued a false press release stating that "Victor Murphy resigned his position … for personal reasons." As Defendants had done previously, they swept Mr. Murphy's bad behaviors under the rug and refused to tell the truth.

54. Mr. LaCroix, Ms. Ford, Mr. Welnetz, Ms. Paulsen and HSSD all owed a ministerial duty to Plaintiffs to speak truth regarding the situation, to refrain from misleading the public about the situation, and to refrain from willfully harassing, bullying and attacking Plaintiffs.

55. Defendants breached that duty when Defendants ignored Mr. Murphy's violent proclivities. Defendants' indifference and failure to rein in Mr. Murphy and to take adequate and reasonable steps to protect B.P. from Mr. Murphy's violent behaviors was a cause-in-fact of Mr. Murphy's attack on B.P. and the resulting harm to Plaintiffs.

56. As a result of Defendants' actions and failures to act, Plaintiffs have suffered severe emotional distress, as well as other damages, losses and injuries to be determined at trial.

<u>COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>
<u>(AGAINST ALL DEFENDANTS)</u>

57. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

58. Mr. Murphy physically attacked B.P. His behavior was extreme and outrageous. When he attacked B.P., he intended to cause her and her family fear, anxiety and extreme emotional distress. In fact, as a result of Mr. Murphy's behavior, Plaintiffs have suffered fear, anxiety and extreme emotional distress.

59. On information and belief, Mr. Welnetz sent an anonymous letters to Mrs. Provost and her employer in which he claimed that Mrs. Provost had a "mental health condition" and was unfit for her job. In that letter, Mr. Welnetz recommended that, as a condition of her employment, Mrs. Provost be compelled to participate in "required personal counselling services." When he sent that letter, Mr. Welnetz intended to cause Mrs. Provost and her family extreme anxiety, embarrassment, fear, and severe emotional distress. In fact, as a result of his

letter, Plaintiffs have suffered severe emotional distress, extreme anxiety, embarrassment, and fear.

60. On February 21, 2020, Ms. Paulsen sent an email to Mrs. Provost in which she spoke on behalf of the HSSD Board of Education and stated:

> Jennifer, we now realize we made the wrong decision, and we as a Board, would appreciate if you and your husband, would teach respect and values to your children from this point going forward.

When Ms. Paulsen sent this email to Mrs. Provost, she intended that her email would cause Mrs. Provost and her family embarrassment, fear, anxiety and extreme emotional distress. In fact, Ms. Paulsen's email caused Mrs. Provost and her family to experience severe emotional distress, embarrassment, fear and anxiety.

61. On information and belief, in mid-March, 2020, Mr. Welnetz mailed another anonymous letter, this time to Mrs. Provost directly. In this letter, Mr. Welnetz shamelessly lied about various events, insulted Mrs. Provost and the manner in which she and Mr. Provost had raised B.P. and D.P., made veiled threats, and roundly condemned Plaintiffs for Mr. Murphy's bad behavior and termination. Mr. Welnetz intended that his letter would cause Mrs. Provost and her family embarrassment, fear, anxiety and extreme emotional distress. In fact, Mr. Welnetz' letter caused Plaintiffs embarrassment, fear, anxiety, and extreme emotional distress.

62. Mr. Murphy had a ministerial duty to refrain from attacking a 9 year-old student on the playground. Mr. Welnetz had a ministerial duty to refrain from sending anonymous, hostile, untrue, and threatening letters to Mrs. Provost and her employer. Ms. Paulsen had a ministerial duty to refrain from sending hostile, insulting and needlessly mean-spirited emails to Mrs. Provost. All three of these Defendants breached those ministerial duties.

63. Further, the conduct of Mr. Murphy, Mr. Welnetz and Ms. Paulsen was malicious, willful and intentional.

64. HSSD was aware of the campaign of harassment, bullying, intimidation and retaliation that was being waged against Plaintiffs. HSSD had the power to terminate that campaign by speaking the truth about its reasons for terminating Mr. Murphy's employment. HSSD chose not to speak truthfully about that decision. HSSD knew and intended that its statement about Mr. Murphy's termination would add fuel to the campaign against the Provosts, would re-direct the anger of the community away from the Board of Education and toward Plaintiffs, and would cause Plaintiffs extreme emotional distress. In fact, HSSD knew and intended that its untrue statements about the circumstances of Mr. Murphy's termination would encourage the campaign against Plaintiffs and result in extreme emotional distress to Plaintiffs.

65. Under the circumstances here, HSSD had a ministerial duty to refrain from issuing untrue statements about its decision to terminate Mr. Murphy, and to correct the misleading statement once it was made. Further, in light of HSSD's knowledge of the hostile campaign being raised against Plaintiffs in the community by its own staff, its own administrators, and its own Board of Education, Defendants' failure to set the record straight about the circumstances of Mr. Murphy's termination was malicious, willful and intentional. As a result, Plaintiffs suffered extreme emotional distress.

66. As a result of Defendants' actions and failures to act, Plaintiffs have suffered severe emotional distress, as well as other damages, losses and injuries to be determined at trial.

<u>COUNT V – CIVIL RIGHTS ACT OF 1871 – "SECTION 1983"</u>

67. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

68. All of the actions of Defendants, as alleged in this Complaint, were undertaken while Defendants were cloaked with the authority of the state. In each instance, Defendants acted under color of state law.

<u>Violation of Constitutional Rights Arising Out of the February 12, 2020 Attack</u>
<u>(Against HSSD, Mr. Murphy, Mr. LaCroix, Ms. Ford and Mr. Welnetz)</u>

69. Mr. Murphy's attack on B.P. occurred in the context of him excoriating her on the playground. In the moments leading up to the physical attack on B.P. and while Mr. Murphy was berating her, he demanded that B.P. to come over to him. B.P. moved obediently toward Mr. Murphy. She said nothing and continued to move toward him until she stood within arm's length. In the moments leading up to the attack and at the moment of the attack, B.P. was completely passive and fully compliant.

70. Despite the fact that B.P. was completely passive and compliant, and despite the fact that she obeyed Mr. Murphy's instructions to come over to him, and despite the fact that B.P. was a nine year old girl at the time, and despite the fact that Mr. Murphy was much older, bigger and stronger than B.P., Mr. Murphy violently lashed out at B.P. using both of his arms and fists to strike B.P. with full force.

71. At the time Mr. Murphy attacked B.P., she was completely compliant, and no discipline was required. Mr. Murphy did not attack B.P. in response to her failure or refusal to heed his instructions. The attack was not an attempt to restore order, maintain discipline or otherwise protect any student. Mr. Murphy's attack on B.P. was not punishment administered in a good faith effort to maintain discipline. Rather, Mr. Murphy's attack was a temper tantrum, and a malicious and sadistic act that he used for the very purpose of causing harm to B.P. The attack was severe and grossly disproportionate to the need presented (if there were a need at all).

Indeed the attack was inspired by malice and sadism, and it amounted to a brutal and inhumane abuse of official power that is shocking to the conscience.

72. Mr. Murphy acted under color of state law. He used state authority and the power given to him by HSSD to violently attack B.P.

73. Mr. Murphy's attack of B.P. violated Plaintiffs' Constitutional rights under the Fourth, Fifth and Fourteenth Amendments. Specifically:

a. When Mr. Murphy ordered B.P. to come to him, he intended to attack her. Mr. Murphy's seizure of B.P. by ordering her to come to him and his ensuing violent physical attack on her was unreasonable, arbitrary and conscience shocking. Mr. Murphy's actions invaded B.P.'s right to bodily security through means so arbitrary, egregious, brutal, demeaning and harmful as to shock the conscience. Therefore, Mr. Murphy violated B.P.'s rights to be free of unreasonable seizures under the Fourth Amendment and her substantive due process rights under the Fourteenth Amendment.

b. Mr. Murphy's attack violated B.P.'s Fifth Amendment liberty interest in her personal security.

74. On information and belief, Defendants were well aware of Mr. Murphy's history of using bullying, intimidation, physical force and violence against the students at HSSD. Despite that knowledge, Defendants failed and refused to rein in Mr. Murphy and to protect the students of HSSD – including B.P. – against his violence and abuse.

75. Mr. Murphy's attack on B.P. was made possible by Defendants' custom, policy and practice to ignore Mr. Murphy's propensity to violence when dealing with the students in his charge.

76. On information and belief, Mr. Murphy knew that, on prior occasions, Defendants had ignored other incidents in which he had unlawfully bullied, intimidated, and used physical force and violence against other HSSD students. Mr. Murphy's knowledge of Defendants' custom, policy and practice to ignore his unlawful behaviors emboldened Mr. Murphy as he bullied B.P., as ordered B.P. to come to him, and as he attacked her. Defendants' custom, policy and practice to ignore Mr. Murphy's behavior in prior cases became the moving force behind Mr. Murphy's decision to attack B.P.

77. Because Defendants' custom, policy and practice was the moving force behind Mr. Murphy's decision to attack B.P., it follows that, in addition to Mr. Murphy's liability for the attack, HSSD, Mr. LaCroix, Ms. Ford and Mr. Welnetz are also responsible and liable for the violation of Plaintiffs' constitutional rights set forth above.

Violation of Constitutional Rights Arising Out of the Defendant's Endorsement of,
and Participation in, the Campaign of Harassment and Bullying Against Plaintiffs
(Against HSSD, Mr. LaCroix, Ms. Ford, Mr. Welnetz and Ms. Paulson)

78. Defendants were aware that Mr. Murphy was well-loved in the community, as well as among many HSSD staff, administrators and students. Defendants were aware that, following Mr. Murphy's termination, a social media "petition" garnered more than 6,000 signatures of persons who demanded that Mr. Murphy be reinstated while blaming Plaintiffs for his termination and condemning Mr. and Mrs. Provost as "lackluster parents." On information and belief, Defendants also knew that hundreds of comments were posted on social media many of which attacked Plaintiffs and blamed them for Mr. Murphy's termination. Defendants also knew that that the campaign of hostility against Plaintiffs included further attacks and hostility on social media, in school, at work, in local stores, and other contexts, including their own neighborhood.

79. In spite of their knowledge of these unjustified attacks, Defendants refused to issue any truthful statement or explanation to the public regarding the decision to terminate Mr. Murphy. Instead, they falsely informed the public that Mr. Murphy had voluntarily "resigned … for personal reasons." Although Defendants had a video recording of Mr. Murphy's attack on B.P., they refused to release a copy of that recording to anyone. Indeed, they refused Plaintiffs' repeated requests for a copy of that recording, thereby ensuring that the untruthful narrative against Plaintiffs would continue. Instead, Defendants chose to remain silent while Plaintiffs bore the brunt of the anger from Mr. Murphy's colleagues (employees of HSSD), his friends, and his supporters.

80. But Defendants did much more than just sit quietly by and watch others viciously attacked Plaintiffs. On information and belief, Defendants encouraged and actively participated in the campaign of hostility against Plaintiffs. That participation included, but was not limited to:

(i) the failure and refusal to take reasonable steps to protect B.P. and D.P. while they were at school against bullying by students, teachers, and coaches;

(ii) a failure and refusal to rein in teachers and other staff members – including, but not limited to, Mr. Welnetz, B.P.'s teacher, and one of B.P.'s former teachers – who were openly hostile toward B.P. and D.P. because of the Murphy firing and who were dismissive of B.P.'s complaints about bullying by her peers because of the Murphy firing;

(iii) active participation on information and belief by numerous teachers and other employees of HSSD in the social media campaign against Plaintiffs;

(iv) a hostile and anonymous letter sent, on information and belief, by Mr. Welnetz to Mrs. Provost and her employer;

(v) a second hostile and anonymous letter sent, again on information and belief, by Mr. Welnetz to Mrs. Provost;

(vi) an email sent to Mrs. Provost by Ms. Paulson on behalf of the HSSD Board of Education stating, "Jennifer, we now realize we made the wrong decision, and we as a Board, would appreciate if you and your husband, would teach respect and values to your children from this point going forward", and

(vii) multiple athletic coaches in the community – some who were employees of HSSD – discriminating against B.P. and D.P., and excluding them and/or limiting their participation because of the Murphy termination.

81.  Defendants' conduct was consistent with, and pursuant to, their custom, policy and practice to ignore, hide and explain-away Mr. Murphy's violent propensities.

82.  The decisions of HSSD, Mr. LaCroix, Ms. Ford, Mr. Welnetz, and Ms. Paulsen to refrain from speaking the truth about the Murphy termination, and their active participation in the campaign of harassment, bullying and intimidation against Plaintiffs violated Plaintiff's' Constitutional rights under the First and Fourteenth Amendments.  Specifically:

a.  Defendants intended that their actions, their failures to act, and their implicit and express approval of and participation in the campaign of harassment, bullying and reprisal against Plaintiffs would encourage, strengthen and grow the campaign against Plaintiffs and would deflect the public's attention from Defendants' role in terminating Mr. Murphy.  That is what occurred.  Defendants also intended that the campaign against Plaintiffs would intimidate and silence Plaintiffs and discourage them from petitioning Defendants for redress of any further grievances concerning any matter.  Defendants hoped to bludgeon Plaintiffs into silence.  Defendants also hoped that the campaign would compel Plaintiffs to remove

B.P. and D.P. from the District. Defendants' efforts to silence Plaintiffs, to deter Plaintiffs from raising any further grievances, to punish Plaintiffs for previously voicing complaints about Defendants' treatment of B.P. and D.P., and to drive Plaintiffs out of the District violated Plaintiffs' rights of free speech and rights to petition Defendants for redress of any grievance under the First Amendment. Because Defendants' actions were unreasonable, arbitrary and conscience shocking, those actions also violated Plaintiffs' substantive due process rights under the Fourteenth Amendment

83. As a result of Defendants' actions and failures to act, Plaintiffs have suffered severe emotional distress, as well as other damages, losses and injuries to be determined at trial.

## COUNT VI – DUTY OF INDEMNIFICATION PURSUANT TO WIS. STAT. 895.46 (AGAINST HSSD)

84. Plaintiffs restate and incorporate by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

85. All of the decisions, actions and failures to act of Mr. Murphy, Mr. LaCroix, Ms. Ford, Mr. Welnetz and Ms. Paulson alleged in this Complaint were decisions, actions and failures to act made by those Defendants while carrying out their duties as officers or employees of HSSD. Furthermore, all such decisions, actions and failures to act were carried out while those defendants were acting within the scope of their employment.

86. Pursuant to statute, the judgment as to damages and costs entered against Mr. Murphy, Mr. LaCroix, Ms. Ford, Mr. Welnetz and/or Ms. Paulson must be paid by HSSD.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment in their favor and against Defendants as follows:

1.  Awarding Plaintiffs compensatory and punitive damages in an amount to be determined at trial;

2.  Awarding Plaintiffs injunctive relief prohibiting any further retaliation by Defendants, and ordering HSSD to pay any judgment as to damages and costs entered against Mr. Murphy, Mr. LaCroix, Ms. Ford, Mr. Welnetz and/or Ms. Paulsen;

3.  Awarding Plaintiffs pre-judgment and post-judgment interest;

4.  Awarding Plaintiffs their attorneys' fees and costs; and

5.  Such further relief as the Court deems just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable in this action.

Dated this 5th day of April, 2021.

LAW FIRM OF CONWAY, OLEJNICZAK & JERRY, S.C.

By:     */s/ Ross W. Townsend*
        Ross W. Townsend, Bar No. 1011622
        Attorneys for Plaintiffs
        Law Firm of Conway, Olejniczak & Jerry, S.C.
        231 South Adams Street
        P. O. Box 23200
        Green Bay, WI  54305-3200
        Telephone:  (920) 437-0476
        Facsimile:   (920) 437-2868
        E-mail:  rwt@lcojlaw.com

3748313