UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

NATHANIEL PROVOST, et al.,

      Plaintiffs,

      v.                                      Case No. 21-C-430

HOWARD-SUAMICO SCHOOL DISTRICT, et al.,

      Defendants.

## ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT

This federal lawsuit arises out of a brief physical encounter between Victor Murphy, a former teacher at Suamico Elementary School, and a student, identified in the complaint as B.P., that occurred on February 12, 2020. At the time of the incident, Mr. Murphy was serving as a playground monitor as the school children were sledding on a hill adjacent to the school parking lot. According to the complaint, as the children were gathering to return to class, Mr. Murphy "angrily reprimanded B.P." and then "suddenly and violently lashed out with both of his arms and fists and violently struck B.P. in her neck and upper chest area." Compl. ¶ 19. The complaint alleges that "the blow was delivered with full force, and the power and violence of the blow caused B.P.'s body to jerk backward and her head and neck to violently whiplash back and forth." *Id.* B.P.'s parents, Nathaniel and Jennifer Provost, complained to the Howard-Suamico School District (HSSD), which then terminated Murphy's employment. *Id.* at ¶ 21. In the days and weeks that followed, the complaint alleges, Mr. and Mrs. Provost and their two children (Plaintiffs) "were subjected to a relentless campaign of harassment, bullying, and retaliation from members of the community including many HSSD students, teachers, administrators, and even the HSSD School

Board who claimed that Plaintiffs were responsible for Mr. Murphy's bad behavior and termination." *Id.* at ¶ 22.

Based on the allegations of their complaint, Plaintiffs claim Mr. Murphy violated B.P.'s rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs further claim that HSSD, HSSD Superintendent Damian LaCroix, HSSD Board President Teresa Ford, and Suamico Elementary School Principal Ryan Welnetz are liable for these violations, as well as Mr. Murphy, because they "were well aware of Mr. Murphy's history of using bullying, intimidation, physical force and violence against the students at HSSD" and "[d]espite that knowledge . . . failed and refused to rein in Mr. Murphy and to protect the students of HSSD—including B.P.—against his violence and abuse." *Id.* at ¶¶ 73–74. Mr. Murphy's attack on B.P., Plaintiffs allege, was made possible by these defendants' "custom, policy and practice to ignore Mr. Murphy's propensity to violence when dealing with the students in his charge." *Id.* at ¶ 75.

The complaint alleges a further violation of Plaintiffs' First and Fourteenth Amendment rights by HSSD, Mr. LaCroix, Ms. Ford, Mr. Welnetz, and HSSD Board Member Rachelle Paulsen as a result of the harassment and bullying they endured in the aftermath of Mr. Murphy's termination. In essence, Plaintiffs allege that these defendants failed to counter the anger and resentment that arose in the community and school following Mr. Murphy's termination with a truthful account of what had occurred. Not only did these defendants sit quietly by and watch others viciously attack Plaintiffs, but Plaintiffs further allege on information and belief that these defendants "encouraged and actively participated in the campaign of hostility against Plaintiffs." *Id.* at ¶ 80.

2

Case 1:21-cv-00430-WCG   Filed 11/17/21   Page 2 of 13   Document 39

The complaint also asserts state law claims for assault and battery against Mr. Murphy; negligent supervision against HSSD, Mr. LaCroix, Ms. Ford, and Mr. Welnetz; negligent infliction of emotional distress against all of the defendants, except for Mr. Murphy; and intentional infliction of emotional distress against all of the defendants. The Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

On June 11, 2021, Murphy filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on the ground that a video recording of the encounter between B.P. and Mr. Murphy demonstrates such de minimis physical contact between Murphy and B.P. that it cannot rise to the level of a constitutional violation as a matter of law. In support of his motion, Murphy submitted a flash drive containing the video recording of the incident. In response to Plaintiffs' objection to the Court's consideration of the video recording on a Rule 12(b)(6) motion to dismiss, the Court converted the motion to one for summary judgment and set a briefing schedule. *See* Fed. R. Civ. P. 12(d). The motion is now fully briefed. For the reasons that follow, Murphy's motion will be granted.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the movant shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue

for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "[A] factual dispute is 'genuine' for summary judgment purposes only when there is 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] 'metaphysical doubt' regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and 'the nonmovant fails to demonstrate a genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Id*. (quoting *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996)).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Where a video recording exists, and "[t]here are no allegations or indications that this videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," a court must view "the facts in the light depicted by the videotape." *Id*. at 378–81. Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

It is clear from the video recording submitted by Mr. Murphy that the complaint exaggerates the nature and force of his encounter with B.P. Contrary to Plaintiffs' allegation that Mr. Murphy "suddenly and violently lashed out with both of his arms and fists and violently struck

4

B.P. in her neck and upper chest area" and that "the blow was delivered with full force, and the power and violence of the blow caused B.P.'s body to jerk backward and her head and neck to violently whiplash back and forth," Compl. ¶ 19, the surveillance video shows that Mr. Murphy grabbed B.P. at the upper arms for, at most, a second or two. The video, which can be viewed at this [link](), depicts Mr. Murphy handing a sled he was carrying to B.P. and pointing to the left. B.P. walked to the left of a snowbank and dropped the sled Murphy had handed her. As B.P. walked away from the sled, Mr. Murphy turned to face her, grabbed B.P.'s upper arms, and abruptly stopped her forward movement. Murphy pointed to the sled B.P. had just dropped, and B.P. walked over to pick it up. B.P. handed the sled back to Murphy and walked away. In grabbing B.P. in such a manner, Plaintiffs claim that Mr. Murphy not only committed an assault and battery against B.P., but also violated her rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Almost forty-five years ago, the Supreme Court rejected efforts to insert federal courts into the use of corporal punishment in the public school setting. In *Ingraham v. Wright*, the Court held that neither the Cruel and Unusual Punishment Clause of the Eighth Amendment, nor the Due Process Clause of the Fourteenth Amendment, provided a vehicle for challenging the use of corporal punishment as it was then authorized by the Florida public schools. 430 U.S. 651 (1977). In that case, two junior high school students sued Dade County school officials for damages and injunctive and declaratory relief, alleging that they had been subjected to disciplinary corporal punishment in the form of paddling in violation of their constitutional rights. The evidence showed that the punishment inflicted was quite severe. One of the students was subjected to more than 20 licks with a paddle while being held over a table in the principal's office. "The paddling was so severe that [the student] suffered a hematoma requiring medical attention and keeping him out of

5

school for several days." *Id.* at 657. The other student was paddled several times for minor infractions. "On two occasions he was struck on the arm, once depriving him of the full use of his arm for a week." *Id.*

Notwithstanding the severity of the corporal punishment shown, the Court affirmed the lower court ruling that no constitutional violation had been shown. In so ruling, the Court noted that "[t]he use of corporal punishment in this country as a means of disciplining school children dates back to the colonial period." *Id.* at 660. At common law, the use of corporal punishment was governed by a single principle: "Teachers may impose reasonable but not excessive force to discipline a child." *Id.* at 661. Given this history, and the language of and history surrounding the Eighth Amendment, the Court concluded that the Cruel and Unusual Punishment Clause had no application to corporal punishment in the schools. *Id.* at 671.

In explicitly rejecting the argument that the Eighth Amendment prohibition should be extended to school children, the *Ingraham* Court noted that because public schools remain open institutions, children had little need for constitutional protection:

> The openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner. In virtually every community where corporal punishment is permitted in the schools, these safeguards are reinforced by the legal constraints of the common law. Public school teachers and administrators are privileged at common law to inflict only such corporal punishment as is reasonably necessary for the proper education and discipline of the child; any punishment going beyond the privilege may result in both civil and criminal liability.

*Id.* at 670.

For much the same reasons, the Court also rejected the petitioners' claim that the Due Process Clause of the Fourteenth Amendment required procedural protections before corporal punishment could be used. Though the Court concluded that "corporal punishment in public schools implicates a constitutionally protected liberty interest," it held that "traditional common-

6

law remedies are fully adequate to afford due process." *Id.* at 672. The reason traditional common-law remedies were sufficient, the Court held, was that "[t]eachers and school authorities are unlikely to inflict corporal punishment unnecessarily or excessively when a possible consequence of doing so is the institution of civil or criminal proceedings against them." *Id.* at 678. Although the Court recognized that requiring administrative safeguards of prior notice and a hearing might provide additional safeguards to students, it concluded that mandating such procedures could substantially reduce the effectiveness of such discipline. "In view of the low incidence of abuse, the openness of our schools, and the common-law safeguards that already exist, the risk of error that may result in violation of a schoolchild's substantive rights can only be regarded as minimal," the Court held. *Id.* at 682. On the other hand, "[i]mposing additional administrative safeguards as a constitutional requirement might reduce that risk marginally, but would also entail a significant intrusion into an area of primary educational responsibility." *Id.* The Court thus concluded that "the Due Process Clause does not require notice and a hearing prior to the imposition of corporal punishment in the public schools, as that practice is authorized and limited by the common law." *Id.*

In light of *Ingraham*, which has not been overruled, it would appear that Plaintiffs' claim that Mr. Murphy violated B.P.'s constitutional rights clearly fails. It is uncertain if Mr. Murphy was attempting to discipline B.P. when he grabbed her by the upper arms or simply get her attention, but regardless, the unmistakable intent of the Court in *Ingraham* was to avoid making "the judgment of which disciplinary punishments are reasonable and which are excessive a matter of constitutional principle in every case, to be decided ultimately by [the federal courts]." *Id.* at 470 n.39. This reading of *Ingraham* has been called into question, however, by the Court's

decision in *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), and the Court of Appeals' application of *T.L.O.* to school discipline cases thereafter.

In *Wallace v. Batavia School District 101*, 68 F.3d 1010 (7th Cir. 1995), for example, a high school teacher and the school district that employed him were sued by the mother of a female student on her daughter's behalf for violating the daughter's Fourth Amendment rights. The alleged violation consisted of the teacher's taking hold of the student's left wrist to escort her from his classroom after she continued to fight with another student, despite being told to sit down. The district court granted the defendants' motion for summary judgment, and the Court of Appeals affirmed. In so ruling, however, the court rejected the defendants' argument that the Fourth Amendment simply did not apply in the school setting unless school officials were acting in conjunction with law enforcement agents with a purpose of enforcing the law. *Id.* at 1013. Relying on *T.L.O.*, in which the Supreme Court held that the Fourth Amendment applied to searches of students by school administrators at public schools, the court noted that other circuits had held that it applied to seizures of students as well. *Id.* at 1012 (citing *Edwards ex rel. Edwards v. Rees*, 883 F.2d 882, 884 (10th Cir. 1989); *Hassan v. Lubbock Indep. Sch. Dist.*, 55 F.3d 1075 (5th Cir. 1995)). The *Wallace* court agreed.

*Wallace* recognized that, "while in school or under the supervision of school authorities, public school students are in a unique constitutional position enjoying less than the full constitutional liberty protection afforded those persons not in school." *Id.* at 1013. "Once under the control of the school, students' movement and location are subject to the ordering and direction of teachers and administrators. 'Unemancipated minors lack some of the most fundamental rights of self-determination—including even the right to come and go at will.'" *Id.* (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 654 (1995)). At the same time, the court noted that "students

do not completely surrender their constitutional rights at the schoolhouse gate." *Id.* (citing *Tinker v. Des Moines Indep. Community Sch. Dist.*, 393 U.S. 503, 506 (1969)).

The *Wallace* court also recognized the different purposes for restrictions on the liberty of students in a school setting from that of an adult in the community. "Deprivations of liberty in schools serve the end of compulsory education and do not inherently pose constitutional problems," the court observed. *Id.* at 1014. "Seizures of individuals by police," on the other hand, "are premised on society's need to apprehend and punish violators of the law. As such," the court explained, "they inherently threaten individuals' liberty to live free of the criminal justice process." *Id.* The court noted that the distinction between deprivations of liberty in school and in the law enforcement context, to which the Fourth Amendment is more commonly applied, highlights what "amounts to an awkward fit between the Fourth Amendment and non-law enforcement action." *Id.*

Notwithstanding these differences, however, the court held that the Fourth Amendment applies to the seizure of a student by a teacher or administrator in the context of a public school. These differences in the underlying liberty at stake and the rationale for restricting it, the court concluded, mean that the application of the Fourth Amendment in the two situations will necessarily vary. *Id.* at 1014. The court thereupon adopted the following standard: "in the context of a public school, a teacher or administrator who seizes a student does so in violation of the Fourth Amendment only when the restriction of liberty is unreasonable under the circumstances then existing and apparent." *Id.* This standard is an objective one that does "not ask what the teacher's intentions are, and does not ask if the particular student thought the conduct was out of bounds." *Id.* at 1014–15 (citing *Graham v. Connor*, 490 U.S. 386, 399 (1989)). Instead, it asks "whether

under the circumstances presented and known the seizure was objectively unreasonable." *Id.* at 1015.

Murphy maintains that, even under *Wallace* and assuming B.P. was seized, the seizure was not unreasonable under the law because the contact was *de minimis*, lasting one to two seconds. Plaintiffs contend that it was objectively unreasonable for Murphy to summon B.P. to stand before him and then, "while she stood passively, quietly and obediently in front of him, . . . suddenly, violently and physically attack her without warning." Pls.' Br. at 16, Dkt. No. 28. As noted above, however, the video recording belies Plaintiffs' allegation that Mr. Murphy "violently and physically" attacked B.P.

Viewing the surveillance video in a manner most favorable to Plaintiffs, it is clear a constitutional violation did not occur. The incident at issue here can be broken up, for the purpose of analysis, into two parts: Murphy's direction to B.P. and the physical contact. Teachers are responsible for maintaining order and discipline in schools. Giving instructions to students in pursuit of that responsibility is eminently reasonable. It is clear from the video that Murphy directed B.P. to come to him, then pick up the sled she had just dropped, and move it to a different location. Prescribing the manner in which students pick up equipment after recess is an inherently reasonable application of Murphy's power as the recess monitor. Even assuming arguendo that, as Plaintiffs allege, Murphy had been castigating B.P. during this time, such an action by a teacher hardly rises to the level of a constitutional violation. A teacher giving stern instructions to a student would not seem out of place, let alone unreasonable, in a school environment. More importantly, it is not the function of federal courts to lecture teachers on how they should address their students. That is the function of school administrators, especially when made aware of a teacher's abusive behavior by parents.

Turning to whether the physical contact was reasonable, the Court finds the Seventh Circuit's decision in *Wallace* instructive. There, the teacher grabbed the student's left wrist and then her right elbow to speed her exit. 68 F.3d at 1011. Wallace stopped moving and told him to let go. When the teacher let go, Wallace walked out of the classroom and slammed the door. *Id.* The Seventh Circuit concluded that no reasonable jury could find that the teacher's actions were unreasonable. "In fact," the court concluded, "the only thing unreasonable in this scenario is that Wallace has made a federal case out of a routine school disciplinary matter." *Id.* at 1015.

In this case, while Murphy's actions may be unseemly and inappropriate, especially when directed toward an elementary school child, they do not rise to the level of an unconstitutional seizure. To be sure, Murphy's conduct also appears far less justified than the conduct of the teacher in *Wallace*. Still, the blink-and-you-miss-it physical contact depicted in the video does not rise above the type of brief encounter dismissed by the *Wallace* court. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). As the Court has noted in the law enforcement context, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotations omitted). It thus follows that in the school context, as well, some deference must be used in applying the standard, especially if "the education of the Nation's youth is [to remain] primarily the responsibility of parents, teachers, and state and local officials, and not federal judges." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). Murphy quickly grabbing B.P. and then just as quickly letting go does not amount to an unreasonable seizure. Murphy's conduct towards B.P., while perhaps distasteful and even tortious, did not violate B.P.'s constitutional rights. Plaintiffs' Fourth Amendment claim must therefore be dismissed.

Plaintiffs also claim that Murphy violated B.P.'s substantive due process rights under the Fourteenth Amendment. In *Wallace*, however, the court noted that the Fourteenth Amendment's Due Process Clause does not afford students any greater protection than the Fourth Amendment from unwarranted discipline while in school." 68 F.3d at 1015 (citation omitted). Since Plaintiffs' claim fails under the Fourth Amendment, it necessarily fails as a substantive due process claim under the Fourteenth.

The same is true as to Plaintiffs' Fifth Amendment claim. The Fifth Amendment binds the conduct of federal officials, not state actors. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'"). Because Plaintiffs bring their claims against the school district and its officials and employees, all of whom are considered state actors, Plaintiffs cannot assert a claim under the Fifth Amendment.

In sum, Plaintiffs' constitutional claims against Murphy are dismissed with prejudice. And because Plaintiffs' claim that Murphy violated B.P.'s constitutional rights fails, their related claim that Defendants HSSD, LaCroix, Ford, and Welnetz violated B.P.'s rights by ignoring Mr. Murphy's past violent behavior and thereby enabling him to attack her in violation of her constitutional rights fails as well. If Mr. Murphy did not violate B.P.'s constitutional rights by unconstitutionally seizing her, then the supervisory defendants did not do so by failing to stop him.

There remains Plaintiffs' claim that the defendants violated their rights under the First and Fourteenth Amendments by their "endorsement of, and participation in, the campaign of harassment and bullying." Plaintiffs apparently believe that HSSD and the defendant officers and employees had an obligation to correct what Plaintiffs believe was a false public perception of the

incident leading to Mr. Murphy's termination and somehow protect them from the animosity that arose in the school and the community as a result of that perception. While the constitutional basis of such a claim is not clear, no challenge to it is presently before the Court. Accordingly, the Court retains jurisdiction over the remaining federal claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. All other federal claims against the defendants are dismissed.

**SO ORDERED** at Green Bay, Wisconsin this 17th day of November, 2021.

s/ William C. Griesbach  
William C. Griesbach  
United States District Judge